### HALSTEAD *v.* NELSON.

*(Circuit Court, Oneida County. March, 1888.)*

1. LIBEL AND SLANDER—PRIVILEGED COMMUNICATIONS—WHAT ARE.

In an action for slander, it appeared that defendant's wife received an obscene anonymous letter, partly in writing, partly printed. Defendant was superintendent of a deaf-mute institution, and plaintiff an employe therein. Defendant took the letter to the chairman of the executive board, stated his belief plaintiff had written it, and they sent it to an expert in penmanship for comparison with some of plaintiff's known handwriting. He pronounced both written by the same person. The entire matter was then laid by them before the whole board, and, though plaintiff denied writing or sending the letter, she was discharged. *Held*, that defendant's statement to the chairman of the executive board was a privileged communication.[1]

2. SAME—ACTION FOR—FINDING BY JURY—SUFFICIENCY OF EVIDENCE TO SUPPORT.

In an action for slander, plaintiff testified on the first trial that when she saw the letter she thought she saw some writing on the margin, but was not positive. On the next trial she did not think she mentioned the margin of the paper in the former trial, but was positive there was such writing. There was no such writing when the letter was produced in court, and five witnesses, then disinterested, testified that there was no writing there at the time she said there was. An expert, who had examined the letter previously, testified that there was none when he had it. *Held*, that a finding by the jury that there was such writing was not supported by the evidence.

On motion for a new trial on the minutes.

Action for slander, brought by Emily Halstead against Edward B. Nelson. Trial by jury, and verdict for plaintiff for $500. Defendant moved for a new trial on the minutes.

*W. E. Scripture*, for plaintiff. *Thomas Spriggs*, for defendant.

KENNEDY, J. The complaint is for slander and slanderous utterances charged to have been made by the defendant of and concerning the plaintiff.

[1] On the subject of privileged communications, see Lynch v. Febiger, (La.) 1 South. Rep. 690, and note; Rainbow v. Benson, (Iowa,) 32 N. W. Rep. 352; Chaffin v. Lynch, (Va.) 1 S. E. Rep. 803; Bacon v. Railroad Co., (Mich.) 33 N. W. Rep. 181; Wheaton v. Beecher, Id. 503; Montgomery v. Knox, (Fla.) 3 South. Rep. 211; Fahr v. Hayes, (N. J.) 13 Atl. Rep. 261; Peirce v. Oard, (Neb.) 37 N. W. Rep. 677.

The following are the words alleged: "The plaintiff, on the 19th day of January, 1878, deposited in the post-office at Rome, N. Y., a letter directed to Mrs. Edward B. Nelson, which letter contained printed matter, and the matter and contents of said letter was obscene and indecent; that said letter was postmarked, 'Rome, N. Y., January 19, 1878,' and had upon it a two-cent postage stamp, canceled; that the address on said letter was in the handwriting of this plaintiff, although she had attempted to disguise the same; that she was the author of said letter and contents;" and that the defendant had said to divers persons, among them B. J. Beach, that "she [the plaintiff meaning] had sent said letter and contents to his wife, Mrs. Edward B. Nelson, through the Rome post-office, and that the address on said letter was in the handwriting of the plaintiff." The complaint further avers that she (plaintiff) was at the time in the employ of the Central New York Institution for Deaf-Mutes, situate at Rome, N. Y.; and that the defendant exhibited and showed the said letter and contents to said B. J. Beach, and other members of the executive committee of said institution; and that, by reason of said statements by defendant, she (plaintiff) was discharged from her place and employment by said executive committee.

The answer of the defendant is a general denial. And, for a further answer, he avers that said institution was, and for a long time previous to the alleged wrongs complained of had been, a corporation duly organized under the laws of the state. That he (defendant) was at that time, and for some time previous thereto had been, superintendent of said institution, and that the officers of the same were controlled and managed by a board of trustees, who appointed an executive committee, among the duties of which was to hire and discharge teachers, employes, and other attendants, and to care for its good and general welfare. At the time of the commission of the grievances complained of, such executive committee consisted of Edward Huntington, B. J. Beach, D. P. McArd, John G. Bissell, and B. Huntington. That about the 19th day of January, 1878, there was received at his house, on the grounds of said institution, through the mail, a sealed envelope, bearing the Rome postmark, directed on the outside, in an apparently disguised handwriting, by a female hand, to "Mrs. Edward B. Nelson, Rome, N. Y.," the defendant's wife. When opened, the envelope was found to contain a paper, partly printed and partly written, of a grossly vulgar and obscene character. Same was without signature. That he, defendant, was well acquainted with the lady's handwriting, and upon examination became satisfied that the address on the envelope was written by the plaintiff. That he thereupon submitted the same, without malice, but in good faith, and in the belief that plaintiff was the one who sent the same, as in duty bound to do, to said B. J. Beach, who was at the time chairman of said executive committee. Upon consultation with Beach, and in order to determine, if possible, who wrote the address on said envelope, it was concluded by him (Beach) to send the same, with certain handwriting known to be plaintiff's, to J. E. Paine, an expert in regard to handwriting, of wide reputation, in the city of New York, to obtain his opinion. Same was sent, and Paine afterwards, and about February 12, 1878, made his report to Beach in writing, and to the effect that the same person who wrote the matter known to be plaintiff's wrote the directions on the envelope. With this evidence of the plaintiff's guilt, and on the 18th day of February, 1878, the executive committee had a meeting for the purpose of acting upon the matter, and said committee, being satisfied that the plaintiff was in fact the author of said communication, thereupon, by formal action, discharged the plaintiff as one of the employes of said institution. The answer further avers that his action in the premises was privileged; he acting in good faith and upon probable cause.

Upon the trial of the issues, it appeared that the Central New York Institution for Deaf and Dumb was a charitable corporation; that, during the

years 1877 and following, the defendant, Nelson, was superintendent of it;
and that the plaintiff, in 1877 and down to her dismissal, in February, 1878,
was employed therein as superintendent of the sewing department. Some
time in the summer of 1877 the defendant was married, and made a tour of
Europe. He returned the latter part of that year, and commenced to live with
his wife in a house upon the grounds and belonging to said institution. On
the evening of the 19th day of January, 1878, there was received through the
mail an envelope duly sealed, and bearing the Rome postmark, addressed to
Mrs. Edward B. Nelson, defendant's wife, postpaid. It was handed by de-
fendant, unopened, to his wife as a part of her mail. She opened it, and found
inclosed obscene printed matter. On discovering its contents, she handed it
to her husband. He looked at it, and on the following day he called upon
Mr. Beach, the chairman of the executive committee of the institution, and
showed him the envelope and contents; at the same time expressing his belief
that the address on the envelope resembled the plaintiff's handwriting, with
which he was entirely familiar. After comparing the writing on the envelope
with writing in their possession known to be the plaintiff's, it was, upon con-
sideration, agreed that, before any charges were made against the plaintiff,
and to avoid doing unnecessary wrong to her, that further inquiries should
be made. To that end, Mr. Beach sent the envelope and matter inclosed to
one J. E. Paine, an expert in handwriting in the city of New York. With it
were also sent papers conceded to be in plaintiff's handwriting, and his opinion
was asked. On the 12th day of February, 1878, Paine made a written report
to Mr. Beach to the effect that the same person who wrote the writing con-
ceded to have been done by the plaintiff wrote the address on the envelope con-
taining the obscene matter, stating in full his reasons for the conclusion.
After reading this report, and duly considering the same, the said executive
committee met for the purpose of further action, and the plaintiff was called
before it. The members present were Messrs. Beach, Huntington, Bissell, and
McArd. Defendant, Nelson, was also there.

The plaintiff, in her testimony, states the following to have taken place at
that time: "I went into the office, and stepped up to Nelson's desk. Mr.
Beach stepped forward, and handed me a letter, and said, 'You sent this.'
I took the letter in my hand, the one now shown me. Beach says, 'Nelson
says you sent this.' I at first understood him to say to Mr. Nelson; I said I
never sent it to Mr. Nelson. Beach says, 'You see it is to Mrs. Nelson.' I
said, 'I never sent it.' Beach said it was a dirty, obscene letter sent to Mrs.
Edward B. Nelson, and if I did not write it and send it, who did? I said I
believed it was a contrived plan to get me out of the institution; that he had
been trying to get me out, and this was his last resort. Beach said, 'Where
were you on that day?' I said, 'I can't tell you until I can find dates to
show.' Beach said: 'I know where you were; you were in Utica, and re-
turned in the evening.' I said: 'I have been to Utica, but whether on that
day or not I can't tell until I find dates to show.' Beach says: 'This is a
plain postmark,—Rome.' I said: 'If this is the day I was in Utica, I was
not in Rome.' Beach turned to Nelson, and said: 'You received this letter
about 7 P. M., did you not?' Nelson answered, 'Yes;' and it was a dirty
letter, and had cost him and his wife some pain, and he knew I wrote the let-
ter. I then examined the envelope, and saw the writing, and it looked like
Mrs. Randall's, then a pupil in the institution. I took the printed slip out of
the envelope. On the edge was a margin about one inch wide. There was
some writing on it. I said it was Mr. Nelson's handwriting; Mr. Beach
stepped to my side, and snatched it out of my hand, and put it in his pocket,
and said, 'It is not for you to read.'" The foregoing is, in substance, all the
evidence given by the plaintiff, upon which the suggestion made that Nelson
acted in bad faith, and without probable cause, in bringing the question of
the authorship of the communication before the executive committee of said

institution, is sought to be supported. It will be perceived that such support rests upon the evidence of the plaintiff that, when she partly drew the paper inclosed in the envelope, she saw some handwriting on the margin which she thought she recognized as that of the defendant; thereby creating the inference that it had been in the defendant's possession before it was mailed to his wife. The following witnesses testify that, at the time the paper was shown this lady, there was no writing of any kind upon the margin, and that the same was in the same condition, in all respects, at that time, as when produced upon the trial: Edward B. Nelson, the defendant; Jessie R. Nelson, his wife; Bloomfield J. Beach, chairman of the board of trustees, as well also of the executive committee of the institution; John G. Bissell, Don P. McArd, members of said committee, and who were each present when the interview between the plaintiff and the committee took place. Each of them testified there was no writing on the margin of the paper. The envelope and contents were sent to the expert Paine, in January, and was returned by him, with his report, on the 12th day of February, the committee meeting being the 19th, same month; and he, having examined the paper with the care necessary to define the writer, testifies that when the paper was in his hands there was no writing on the margin. On the first trial of the case the plaintiff testified, upon the subject of the writing on the margin, substantially as follows: "I think I saw some writing on the edge of the printed paper when I partly took it out, but will not be positive." On this trial she testified: "I don't think I mentioned the margin on the paper on the last trial."

Examining the evidence with a view to determine what legitimate conclusion should be drawn from it, the first suggestion which presents itself is, "improbability," which necessarily attaches to the statement made by the plaintiff. Defendant had but recently married his wife; and to suppose that he would write upon the margin of this obscene and scandalous document, and deliberately inclose the same in an envelope, and address and mail to her, bearing this evidence upon its face of his own depravity, is beyond belief. If the testimony of the plaintiff is true, the defendant, with this evidence of his own guilt, placed the same paper in the hands of Beach for examination when he knew him to be an astute man, familiar with handwriting, a gentleman of the highest character, and one whom he (defendant) had a right to believe would be swift to discern and denounce the fraud if it had been perpetrated. With equal improbability we are asked to believe that this same paper, with this telling evidence against him, the defendant submitted to the examination and criticism of Paine, the expert, and afterwards to the executive committee when in session. In my judgment, the probabilities which challenge and tend to refute the truth of the plaintiff's testimony in this regard are too strong to be overcome by her statement, and tend to the irresistible conclusion that she must be mistaken. *Stilwell* v. *Carpenter*, 2 Abb. N. C. 238; *Seibert* v. *Railway Co.*, 49 Barb. 583–587. In giving her evidence, she is necessarily influenced by the important interest which she has, and which she must feel she has, in the issue involved. The defendant, Nelson, has, perhaps, as great an interest, and his wife must be regarded as in full sympathy with him in this respect; but Mr. Beach, Mr. Bissell, and McArd, of the executive committee, are each gentlemen of high standing in the community, and the truth of whose evidence cannot easily be doubted, are disinterested, and their connection with the matter was and is only that of men having an important public duty to perform, and who can have no other purpose than to discharge it conscientiously, and with due regard to the right of the respective parties. Paine, who appeared without interest, and whose character is in no way impugned, also speaks upon the question. These all testify that there was no writing on the margin of the paper at the time of which the plaintiff speaks. The plaintiff upon the first trial, and before the importance of connecting the defendant with the sending of the letters had

been suggested, speaks with doubt and uncertainty as to there having been any writing upon the margin of the paper, and did not even mention there being a margin on it until the trial preceding this. It is not, perhaps, unjust to say that it is not impossible that her memory, in regard to this particular matter, has been created by long reflection, and after learning the importance of the evidence as bearing upon her success in the case. The finding of the jury, as it must have found in order to have reached the verdict which it did, that there was writing by the defendant on the margin of the paper inclosed in the envelope, cannot be sustained upon any available ground, or as a legitimate or fair deduction from the evidence as given. *Boyd* v. *Colt*, 20 How. Pr. 384; *Lynch* v. *Pyne*, 42 N. Y. Super. Ct. 11–14. When the paper in question was produced upon the trial, there appeared to be written in pencil across it, not along the margin, under the head, "Female Protector No. 1;" "I have been married 12 years, having child; convenient. The syringe will do just what it says it will with using." And under the head, "Female Preventative Powers," "a lady's friend." No suggestion was made that the plaintiff wrote this.

The occasion of the communication by the defendant to the committee was privileged. He owed them the duty, and would have been derelict had he omitted to perform it. Odger, Sland. & Lib. 182. I was inclined to think upon the trial that this was an absolute privilege, and that any communication made by the defendant to the committee was a privileged one, and that no recovery could be had in any view of the case. When the case was before the general term, that court seemed to view the privilege as a qualified one, and that if it appeared or there was satisfactory evidence given of malice, bad faith, or a want of probable cause, that then the defendant might be liable; and it was upon this interpretation of the law that cause was tried. The defendant held the position of superintendent of a public institution, and was responsible for the proper administration of its affairs, and especially for those relating to the moral as well as physical care and training of its inmates, subject, nevertheless, to the supervision and control of the board of trustees and its executive committee. Holding this responsible position, it was his duty, if he honestly believed that an employe under him had been guilty of conduct unbecoming her, and the position she occupied, to report the same to his superiors, the committee; and if, in making such report, he acted in good faith and with probable cause, although such suspicion turned out to be groundless, he would not be liable, since such action and communication was privileged, within well-settled rules. The occasion of the publication repels the inference of malice. *Van Wyck* v. *Aspinwall*, 17 N. Y. 192, and cases cited. In the case of *Harrison* v. *Bush*, 32 Eng. Law & Eq. 177, cited in the above case, Lord CAMPBELL is made to say: "A communication made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contains criminating matter which without the privilege would be slanderous and actionable. Duty, in the proposed cause, cannot be confined to legal duty, but must include moral and social duties of imperfect obligation."

The plaintiff, in her evidence, makes the defendant say, "I know you wrote it," in the presence of the committee. This utterance, had it been made to them, with the charge, would have been privileged, if any part of the communication was; and it was equally so when spoken to them in the plaintiff's presence, authoritatively made a part of it; and this is so if the utterance can be regarded as a positive statement, rather than simply the expression of an opinion. I am disposed to think the latter is the true construction to be given it. In the case of *Humphreys* v. *Stilwell*, 2 Fost. & F. 590, it was held, when the defendant, who was a life governor of a public school, to which the plaintiff supplied butcher's meat, stated to the servant of the school whose duty it

was to examine the meat that the "plaintiff had been known to sell bad meat," that the communication was privileged. It was held to be the duty of an under-master in a college school to inform the head-master that reports have been some time in circulation imputing habits of drunkenness to the second master. *Hume* v. *Marshall*, 37 Law T. (N. S.) 711, (COCKBURN, C. J., term of November 26, 1877.) The law is so held in this case, 36 Hun, 149; *O'Donaghue* v. *McGovern*, 23 Wend. 26. Malice is defined as an indirect or wicked motive which induces the defendant to defame the plaintiff; and the plaintiff must prove malice by some evidence besides that which merely proves the falsity of the statement. *Cauldfield* v. *Wheworth*, 16 Wkly. Rep. 936. That the defendant was mistaken in the words spoken confidentially, taken alone, furnishes no evidence of malice. *Lewis* v. *Chapman*, 16 N. Y. 369; *Vanderzee* v. *McGregor*, 12 Wend. 546; *Fowles* v. *Bowen*, 30 N. Y. 20. If the evidence produced is equally consistent with either the existence or non-existence of malice, the court should stop the case; for there is nothing to rebut the presumption which has arisen in favor of the defendant from the privileged occasion. The only case where extrinsic evidence of malice can be necessary is when the occasion of speaking the words show that they are *prima facie* excusable, as being privileged. *Root* v. *Lowndes*, 6 Hill, 520.

The relations existing between the plaintiff and defendant were friendly, as evidenced by the letters from her to him of date of July 11, 1877, and continued to November 5, 1877. No change in the feeling there exhibited is shown to have taken place, and no possible motive for the existence of malice on defendant's part towards the plaintiff appears. The question involved did not of necessity require that it should appear that the plaintiff actually addressed and sent the matter. The question is, had the defendant probable ground to believe she sent it? After the matter had been laid before the committee, and the suspicion created that the plaintiff was the guilty person, means were taken, and such I think as a prudent man under the circumstances would have adopted, to verify the truth of the same; and until that was secured, through the report of the expert, no charge was made, and no other or different action taken. When that came to hand, the plaintiff was summoned before the committee, and then she was charged by the chairman, Beach, with having sent the communication. The important question in the case is, did the defendant have probable cause to justify his action? Unless there was evidence satisfactory to show that the defendant had some knowledge or reliable information that the plaintiff did not send the envelope, and therefore that he acted in bad faith and without probable cause, he was fully justified in what he did, and in doing it he incurred no liability to the plaintiff. The only evidence showing or tending to show this is that of the plaintiff, before referred to, that there was some writing on the margin of the inclosed paper which she thought was written by the defendant, and which was refuted by the evidence and in the manner before referred to. In my judgment, the jury must have misconstrued the evidence, or failed to give it its legitimate effect, in arriving at the conclusion they did. The verdict being, then, clearly against the weight of the evidence, but one duty is to be performed, and that is to set it aside, and grant a new trial. *Conrad* v. *Williams*, 6 Hill, 444.

The verdict, if allowed to stand, would be not simply unjust to the defendant, but as a precedent is one that would be likely to seriously interfere with a proper discharge of duty on the part of those innumerable persons who occupy relations similar to that of the defendant, and upon the due performance of which the welfare, and perhaps safety, of many depend. It would seem that less harm would likely arise from the adoption of a rule that communications of this nature are absolutely privileged than there will be in holding the privilege qualified, and that the party making it may be subject, as to liability, to the infirmity in memory of the complaining person, or to the

fraudulent manufacture of a case of probable cause to meet the purpose of an unjustifiable prosecution, as it may well be supposed might sometimes happen.

My conclusion is that the verdict should be set aside, and a new trial granted, with costs to abide the event. An order to this effect will be entered.